Please call the next case. 213-617-3S Services, Inc. v. Michael Floyd May approach and begin. Good morning, Your Honors. Counsel.  My name is Mary Labreck. I'm an Assistant Attorney General here representing the Illinois State Treasurer as Ex Officio Custodian of the Injured Workers' Benefit Fund. My co-counsel and I would like to split our time equally. The principal issue in this case is whether 3S Services qualifies as Michael Floyd's employer within the meaning of the Workers' Compensation Act. The Treasurer is interested in this case because if 3S is not deemed the employer, then Floyd's benefits will have to be paid from the fund. And it is important for all of the workers who rely on the fund that employers be prevented from shifting their legitimate responsibilities onto it. Defense of the fund is particularly critical right now because for the last two years, the fund has been unable to satisfy the demands for relief. The Commission's annual report for fiscal year 2013, available on its website, shows that although the fund took in more money in fees and penalties than it had in the year before, it was able to pay only 31% of the value of the submitted claims. Yeah, but that can't be a basis for a decision as to whether the fund has some liability. Right. No, I just wanted you to know what was at stake, though. We urge this Court to uphold the Commission's determination that 3S was Floyd's employer for four reasons. The first is that the Commission's finding that 3S jointly employed Floyd in Metro is defensible. In all the cases, mutual control and mutual benefit are the essence of the test for joint employment. In fact, in the related context of labor relations, the Illinois Supreme Court has defined joint employment in terms of control alone. And if Metro exercised control over and benefited from Floyd's labor, it is clear that 3S did as well. Perhaps the best evidence that 3S controlled Floyd is Schmidt's own testimony before the arbitrator that he intended it should. In his own words, the idea behind the incorporation was that I could have the type of crane that I wanted and the type of operator that I wanted for 3S services. In other words, he wanted to control Floyd's labor for the benefit of 3S. Moreover, Schmidt got the benefit of his bargain because it is undisputed that 3S had first dibs on Floyd's time. It is the right to control that matters, even if the right is not always exercised. And nothing that Floyd did was incompatible with his being 3S's employee. Now, there are a few cases that have expressed some discomfort with the idea of applying the joint employment standard in circumstances where the wages were not shared. But none of these cases, and there is no case that has held that issue dispositive, and there is one case that held that it was not dispositive and found that the question of who pays an employee's wages is only one factor to be considered, along with other factors. The case says, I mean, the right to control, it's not dispositive, but the case law indicates that's the most important factor, isn't it? That's right, Your Honor. Do the cases say that? Do the cases say that it's the most important factor? Right. They do, don't they? Yes. Okay. And as a preliminary matter, just in terms of our review of the Commission's decision, and hence what should have been the standard for the Circuit Court, as to whether or not he was a joint employee, is that a question of fact that is being reviewed, or is that a question of law? Because it looks like in the Circuit Court's order, it found that that determination was a question of law. It did. The fundamental question of whether any particular entity is the claimant's employer is a question of fact. So it's manifest weight, right? Right. So it's manifest weight. There may be some of their arguments may entail questions of law. When they, for instance, on the statutory employer issue, when they argue about the meaning of a provision. But the fundamental standard of review we're looking at here is manifest weight. Well, it would have to be. I mean, if the right to control is considered to be a critical factor, the right to control isn't determined as a matter of law. It turns on the facts of the case, right? That's right, Your Honor. And so, and even if, the second reason I wanted to mention is even if this Court disagrees with the Commission's use of the term joint employment in this context, it should still uphold the Commission's decision, because the essential thing was the Commission's finding that there was an employment relationship, not what subcategory the relationship fits into. The finding that the 3S was an employer of some kind is the determination that is entitled to deference under the manifest weight of the evidence standard, as Your Honors have suggested, and which this Court should uphold unless the opposite conclusion is clearly evident. As the appellate court noted in Freeman, the question is whether the employer meets the definition of employer in Section 182 of the Act. And this definition, like the other provisions of the Act, must be liberally construed in favor of coverage. And as Your Honor has mentioned, it is well established that the most important indicator of an employment relationship is the right to control. And that is why we're arguing it's so important in this case. And thus, the Court in Freeman was able to find an employment relationship, even though it found that neither the borrowing lending paradigm nor the joint employer paradigm applied in that case. 3S has argued and will argue, I'm sure, that this Court must respect Metro's separate corporate identity. But that is not so. We don't argue that the separate corporate identity should be ignored. It is considered as one of the factors. However, even Schmidt, the case that 3S has relied on, allows that the rule can be relaxed where justice requires. In any event, the Illinois Supreme Court has refused to be bound by corporate identities in a related administrative context. In Pipe Trades v. Relich, the Court held that the previous version of the Department of Employment Security was concerned with substantial ownership and control of employing units rather than the technical rules of corporation or partnership law. And this Court has already held that incorporation is not dispositive in distinguishing whether someone is an employee or an independent contractor. In the Ware case, this Court held that a particular claimant was an employee, even though he had incorporated for income tax reasons. I think that's clear. I don't think anybody would dispute that. Okay. Third, the third reason is that allowing 3S to insulate itself from liability in this case would violate an important public policy, because the Act does not allow employees to waive their right to benefits, nor does it allow employers to contract around benefits. That policy would be nullified if all an employer had to do to achieve the same result is create a corporate shell around each employee. Now, I realize that 3S says that it didn't intend to defeat the Act, but only the union's policies. I'm skeptical that the fact that nobody ended up paying any for workers' compensation insurance was a happy coincidence. But even if that's right, if the Circuit's Court's judgment is not reversed, the same strategy will be used by other companies in order to avoid workers' compensation benefits in the future. You're splitting your time equally, am I correct? Yes. Okay. Your time is up. Are you splitting your time on reply as well? Yes, I'd like to do that. Okay. Okay. Sorry, Your Honor. We'll rely on our briefs. Seven and a half minutes is a short period of time. Thank you. Please support counsel Patricia Cook on behalf of the injured work person, Mike Floyd. Seven and a half minutes is a short period of time, so I agree with everything she said, but I'm going to add a few points. The Circuit Court decision does have three errors in it. The first error is when it reversed the Commission's finding of joint employment and the associated arising under issue. The second error was when it concluded that 3S was not a statutory employer pursuant to Section 183, and it also erred when it reversed the award of 19L penalties. On the joint employment issue, the Circuit Court found that the facts regarding the joint employment issue were, quote, not in dispute, proceeded to apply a de novo standard of review to what are called a question of law. Well, 3S had advocated for the de novo standard at the Circuit Court level, but in order to have the undisputed facts you need for the de novo standard, 3S would have had to stipulate that, first, 3S controlled Mike Floyd's employment, second, they benefited from Mike Floyd's employment, third, 3S hired and could fire Mike Floyd, and fourth, that 3S commingled its employees, vehicles, equipment, and premises with Metro Crane. The problem is 3S did not stipulate to these facts. Mike Floyd proved these facts at trial, but 3S has never agreed to or stipulated to these facts. So by definition, these are disputed facts that required the Commission to weigh the evidence and make factual determinations. The joint employment issue couldn't be resolved without making factual determinations, and this issue was never a question of law. The Circuit Court applied the wrong standard of review. It disregarded expressed, uncontradicted testimony on factual issues, and it substituted its own findings for those of the Commission. And it got it wrong. It got it so wrong that paragraph 9 of the Circuit Court's decision that Craig Schmidt controlled and directed the work of Mike Floyd in Craig's capacity as an officer of Metro is actually contradicted by Craig's own testimony in the record. The application of the wrong standard of review on the joint employment issue is a fatal mistake and requires a reversal on that issue. When the correct standard of review, which is the manifest weight standard, is applied, the Commission's decision is easily reinstated. The only question on the manifest weight is whether there's sufficient evidence in the record to affirm the Commission's decision. My brief has quite a few examples of the sufficient evidence in the record concerning the control, the benefit, the ability to hire and fire, the commingling of resources between the two companies. I've listed many examples of those. Ms. Labreck gave a few of those already. So there is absolutely sufficient evidence in the record to affirm the Commission's decision. 3S likes to point out that Mike Floyd was paid with a Metro Crane paycheck. However, the uncontradicted testimony of Craig Schmidt was that 3S paid Metro penny for penny for every minute that Mike Floyd worked on a 3S job. So the circuit court's decision on the joint employment issue and the associated arising under issue is wrong and should be reversed. With regard to the statutory employment issue, that is still a viable way to determine employment in this case. The circuit court erred when it decided that 3S was not a statutory employer because the accident occurred away from the construction site, and it incorrectly relied on help and in this regard. This issue involves statutory construction and is subject to the de novo standard of review here. So this is a separate standard of review. I don't want you to run out of time, but can you address penalties? I can address penalties. The record, the undisputed evidence in the record was that there was a pattern where TTD benefits were repeatedly withheld for weeks on end until I filed a motion for penalties and then the back TTD would be paid. This went on for about two years during the time that 3S wasn't disputing the case. They weren't disputing that they were responsible. They just were not paying the benefits and they were not explaining it. They didn't explain it at trial. Once they said they were disputing on the employment issue, we didn't seek penalties for nonpayment after that. They had proffered their good and just cause and it didn't fall under 19L. But for that period of time before that, 19L says you have to pay and if you don't pay, then you need to explain it. And they never explained it. They didn't object to the evidence at trial. There was no explanation. So the penalties were absolutely appropriate under 19L and the language of 19L in the case law supports it. I would like to go back to the statutory employment if I do have a couple more minutes. The circuit court relied on helpin' for the statutory employment and helpin' can be distinguished from our case on three grounds. First, helpin' didn't involve a written contract that expressly defined where the work was to be performed. In our case, we do have that. 3S was contractually obligated to mobilize the crane and it was further contractually obligated for the crane rental for portal to portal. So his work in driving the crane when he was hurt was contractually required and directly connected to the work of the principal 3S. Second, helpin' hired Henry Van Kirk. He didn't hire the deceased in that case. Helpin' didn't even know that the deceased was working that day. So the elements of supervision and control were missing in helpin'. In our case, Mike Floyd was specifically hired by the principal and the uncontradicted testimony is that 3S controlled his activities every day, whether it was a 3S job or another. So the supervision and control elements that were missing in helpin' are present here. The last way this case can be distinguished is that the Supreme Court in helpin' relied heavily on the fact that there was no evidence in the record that the deceased was actually hauling sand when he was killed. The principal in helpin' had contracted for his sand to be hauled and because the work of the principal that the principal had contracted for was not being performed when he was injured, the statutory employment didn't apply. In our case, okay, in our case, he actually was doing what was contracted for. Thank you. You dropped something there, counsel. My name is Steve Wolf and I represent 3S Services. I'd like to jump right into things. One thing that has to be absolutely clear is there is no dispute that there were two separate corporations, 3S and Metro. There's also no dispute that the claimant worked for Metro. Also, there's no dispute that Craig Schmidt had an ownership interest in both 3S and Metro. Where the dispute arises is in what capacity was Craig Schmidt acting when he gave direction or interacted with the claimant, Mr. Floyd? Well, can I interrupt you there? You said that there's no dispute that Floyd was working for Metro. Yes. I think there is a dispute, at least Mr. Floyd is indicating, that in essence he worked for 3S and that the circumstances, even though his payment may have come from Metro, which is potentially what you're going to say equates with working for, the circumstances as described here in the brief, according to Mr. Floyd and the treasurer, would point towards a working relationship with 3S. If I can respond, first of all, by reading from Mr. Floyd's brief on page 31 of their opening brief, and I'm quoting verbatim the first full paragraph. It is not disputed that an employee-employer relationship existed between Mike Floyd and Metro. It is also not disputed that Metro was 3S's uninsured subcontract. So we know by the stipulations I just read from counsel's brief and the facts that there was, in fact, two separate corporations. That is a patron. The fact there's two separate corporations is a factor, but that doesn't mean that's the be-all, end-all of the test. No. It couldn't, otherwise you wouldn't be here. No, but we also know that Mike Floyd always worked for Metro. Mike Floyd was a crane operator. The business of Metro was operating a crane. The business of 3S was iron erection. The businesses were completely different. One relied upon another, like many contractors rely upon subcontractors. General contractors hire plumbers and welders and electricians, and iron subcontractors have to have a crane company, but their business... Let me ask you a pointed question, because as you know, the right to control is paramount under the case law. Although 30 percent of Metro's work was done on non-3S jobs, he testified that prior to accepting a non-3S job, he specifically had to obtain approval from Craig. Now, why does he have to obtain approval from Craig if he doesn't have anything to do with 3S? Craig does have a lot to do with Metro. Craig Schmitt is an owner of Metro. And the spin here that Mr. Floyd's counsel is trying to put on the case is whenever Mr. Floyd contacted Craig Schmitt, he would like the justices to believe that he was always speaking on behalf of 3S. And the fact of the matter is when Craig Schmitt interacted with Mike Floyd, it was in Craig Schmitt's capacity as an owner of Metro. And the case law makes that very clear that these types of relationships happen quite often, and the court must respect the individuality of the separate corporations and look at what role the person is acting in. The only way that Craig Schmitt could have directed, influenced, or exercised any control over Mr. Floyd was as an owner and shareholder of Metro Crane, not as an owner and shareholder of 3S services. Because of the separation of the two corporations, 3S had no control over Metro. They had separate bank accounts. They were separately incorporated. Metro had separate... Didn't he testify that specifically Metro was formed to benefit 3S's business? That was one of the reasons, yes. That was the primary reason. But in reality, we know that that's not what Metro did. Mike Floyd brought to the table his book of business, his contacts with other contractors. This other 30% of the business, Craig Schmitt and 3S had nothing to do with it. That was all Mike Floyd. And that's what he brought to the table. He brought the expertise in the crane. He went out and selected the crane. He repaired the crane. He identified when it needed service. He operated the crane. 3S services had no experience, no ability to do that. And that wasn't their business. Their business was iron work. So Metro Crane was set up to allow Mike Floyd to run that business and to be the operator of that crane. In fact, when Mike Floyd was injured... Under the control of Craig and 3S. Under the partial control of Craig Schmitt, yes, as a shareholder of Metro Crane. The commission found a joint employer relationship. Is there any question that this involves question of fact? It doesn't involve a question of fact because the basic facts are undisputed. Those basic facts being they were separate corporations. Craig Schmitt operated as an officer of 3S. Doesn't Roberson v. Industrial Commission, Illinois Supreme Court decision, fairly state that whether an employment relationship exists is a factual question? Yes, I agree, but the question here is not whether an employment relationship exists because we know based upon the stipulations of the attorney for Mr. Floyd and the undisputed facts in the case that Mr. Floyd was in fact employed by Metro Crane. Nobody's disputing that. Nobody's disputing that. In addition, you're forgetting the word joint. Now, there may have been an employment relationship with Metro, but the key here is also was there a joint employment relationship with 3S? I would ask this question, if I may. What was Mr. Floyd doing for 3S at the time of this accident? Because it doesn't matter whether Mr. Floyd would have been at some other time acting on behalf of 3S. All that matters is at the time of this accident, what was he doing on behalf of 3S? Nothing. There's no dispute. Nobody's saying that he was doing something on behalf of 3S. Why would he have to be doing something for both of them? Is that your argument? What's the control? What is the control that 3S had over Mike Floyd at the time of this accident? I mean, you can't take jobs without getting 3S's approval. Didn't the contract require portal-to-portal rental of the crane? Industry standard, they all do, yes. Okay. But wasn't he in the process of transporting the crane? Yes, he was. Okay. So, I mean, isn't that something that's being done in furtherance of 3S's interests? Well, if you accept that proposition, then you would have to accept the proposition that any time any subcontractor under any scenario is doing something pursuant to a contract with a contractor, that he's working for that contractor. We know that's not the case. Well, you're ignoring all of the other things that Mr. Floyd is suggesting brings about this joint employer relationship. All of these other qualities. So, you know, put aside this, you know, suggestion that you have that it might apply with other general and subcontractor relationships. You've got that specific circumstance coupled with everything that Justice Hudson was just talking with you about and counsel just talked about in terms of this commingling, basically, of an employee. That's my point, though. There is no commingling. All of this is a red herring because we know that Mike Floyd works for Metro. Nobody disputes that. Could you answer this one question that's really bothering me? And let me rephrase it, okay? You pointed out, well, there's nothing going on here that doesn't go on with normal contractor subcontractors. Does the normal subcontractor need the permission of the general to go out and work on other jobs? Do they? He didn't need the permission. He booked those jobs himself. He didn't need the permission to use the crane? But when he got that permission, he got it from Craig Schmidt as an owner of Metro. That's the distinction. Craig, there's no question that Craig Schmidt was involved in the operation. For non-3S jobs. Why would he even go to him, okay? Because he's an owner of Metro. Craig Schmidt calls himself a figurehead of Metro. He was 75 percent owner of the business. Okay, but a figurehead doesn't quite fit with how you're describing Craig Schmidt vis-à-vis Metro. If you look at the testimony, it's clear that Craig Schmidt didn't know how to operate a crane, didn't even go out and select a crane, even though he purchased the crane. He put up the money for the crane. He didn't know how to fix the crane, didn't know how to operate it, didn't have, didn't sign the contract with the union. But he had the right to control. You're pointing to paper things, you're not pointing to the right to control. Yes, he had a right to control as an owner of Metro Crane. The distinction I think that we're missing here is that Craig Schmidt was an owner of Metro Crane. Okay, who owns the crane? The crane was owned by 3S, leased to Metro Crane.  Why did they need to get permission for non-3S jobs? What has 3S got to do with this stuff? Craig Schmidt was involved to the extent that he was an owner of Metro Crane. And that, I believe, is why the circuit court found that there was no disputed questions of fact and found that this was a question of law. I agree with the circuit court. If the panel does not agree, if you look at the evidence, even on a manifest weight standard, the manifest weight of the evidence is clear that they were separate corporations, that they were run separately, they had separate business, they were operated that way, that Mike Floyd had ample opportunity to operate the crane and... Where did Floyd's paycheck come from? Metro Crane. Every single time. It was prepared and distributed by a 3S employee, wasn't it? It was issued by a 3S employee as an administrative matter. If Metro has nothing to do with 3S, why is 3S involved in the preparation of the check? I didn't say Metro had nothing to do with 3S. This is true as in many small businesses would have common ownership, as in the nut case. Oftentimes, people have cross-responsibilities. Just because a clerical function was performed by someone from 3S doesn't mean that Metro didn't exist. We're not disputing that Metro was a freestanding independent corporation. We're not trying to pierce the corporate veil and show that it was a sham and really didn't exist. We know that Metro really existed. So the fact that... You're saying Metro had nothing to do with 3S, right? Metro had nothing to do with 3S. Okay. Why did Floyd have to be... Prior to accepting a non-3S job, Floyd had to obtain approval from Craig. You're saying because he worked for Metro. But if it's a non-3S job, why would he need approval to do anything? Whenever he dealt with Craig Schmidt, he dealt with Craig Schmidt as an officer and majority shareholder of Metro. 3S entered into contracts with Metro. They were written contracts. They were done on an arm's length transaction. 3S paid the same rate for the crane that all of the other operators did. They were billed like all... Go back to your example. Does the average subcontractor have his paycheck prepared and distributed by the general contractor? In some situations, I'm sure they do. But I can't answer that situation. I can't answer the question. Usually not because there's some connection between the two of them. Really? Well, there's no question there's a connection. There's common ownership. There's common ownership. Administrative tasks are being done by one... The argument is common right to control as well. That's what the commission... And I submit to the justice that the right to control was exercised by Craig Schmidt as an officer of Metro. The contract that was entered, there was a written contract entered into between Metro and 3S. At the time of the incident, okay, Floyd is operating the crane, putting it away for the night, so to speak. Correct. The work had been done. He had left the job site an hour... The work was being performed by Metro. Is that correct? At the time of the accident? No, at the job site. At the job site, the crane work was being performed by Metro pursuant to a contract with 3S. Pursuant with contract with 3S. Yes. Okay. Addressing the 1A3 issue just briefly, Halpin is on point. I mean, no case is ever 100% on point. But if you read the decision in Halpin and you read the dictum, which I think is very informative, and if I can have a little bit of leeway by the Court, I hate to read things, but the Halpin Court said, surely plaintiff in error, which would be the petitioner in this case, should not, I'm sorry, would be the employer, would be 3S in this case, should not be held responsible for the safe passage of an employee over a road not in any way connected with or used in the work of the principal employer and over which highway he has no control whatsoever. The statute is not ambiguous. In plain language, it says that shall not apply where the accident occurs elsewhere than on, in, or about the immediate premises on which the principal has contracted that the work be done. And the contract indicated it was portal to portal, right? As all contracts do. Well, so that's this contract. Industry standard. But is this contract correct? Yes. Okay. So why doesn't that line, our counsel has indicated that line brings in the statute. Because the statute, if you read the statute, why would that last section of the statute be there? Why would that last sentence be in the statute? It says immediate premises. I'm reading from Halpin now. Does not mean an area of two and a half miles over which workmen travel over public highways in going to and from the place where the work of the principal contractor is being done. But in Halpin, and this involved horses, Halpin involved a case. What was the date of Halpin? That was 1935, I think. It was a very old case. 1925. It didn't involve a contract like what we have here, and a contract that very specifically indicated it covered the employee's actions from portal to portal. The principal is the same. The language of the statute is unambiguous. On, in, or about the immediate premises. Okay. Do you have any case that defines immediate premises in, not Halpin, because Halpin doesn't involve a contract. Do you have any case that defines in or about the immediate premises where you have a contract that defines the location of the work? No. Okay. But the contract doesn't define the location of the work. The contract just says we are going to pay portal to portal. The transportation of the crane is clearly incidental to the work, but it is not part of the work. And there's a reason for that. How can a general contractor, or in this case 3S, have any control whatsoever over the circumstances of the work that's being done when it's not on the premises where the work is being done? If the legislature had wanted it to incorporate anything included in the contract, including transportation of a piece of equipment, the statute could have been written much more broadly. The statute was expressly written, including those words, on, in, or about the immediate premises. Those words have to have meaning, and their natural and ordinary meaning is just what they say to. On, in, or about the immediate premises. Thirty-five miles away, an hour and a half after the work was done does not fall within that definition. Your time is up. Yes. Thank you. Okay. Thank you. You're splitting your time on reply, two and a half minutes. Okay. Your Honor, I'd just like to say that a big difference between this case and the Nutt case with respect to the main question of joint employment is that in the Nutt case, the court found no control from another company in the little cluster of companies that was part of that case. And the only relationships among the companies were that of customers. And I'd just like to say briefly about the statutory employer case. To give that particular provision part of the statute that counsel was talking about meaning, I think it gives it sufficient meaning, which is consistent with Halpin, to say that it means that the statutory employer's liability should not be construed as completely coextensive with that of the direct employer. That is, that the statutory employer covers just because the direct employer does. But there are some things having to do with preparation for the job that would be exclusively within the control of the direct employer, as in Halpin, caring for the horses at lunchtime. And as counsel said, the difference here is that the injury here occurred in the course of work for which 3S specifically contracted. And the company had no less control over Floyd on the highway than any employer who contracts to have someone transport things on the highway. Thank you. I'm sorry. For all the reasons brought forward in our argument and briefs, I pass this court to reverse the circuit court's judgment, thereby reinstating the commission's decision that Floyd was the employer and making 3S and not the fund responsible for benefits. Counsel for 3S just ignores his own client's testimony. Craig Schmidt himself testified that he played no management role in Metro. He said it came out of his own mouth. He did not do it. He had nothing to do with the crane, no management role. All he did was pay the bills, deal with the lawyers, and sign the paperwork from the state. Craig Schmidt didn't deny Mike Floyd's testimony that he was required to get 3S's permission on all the jobs. Craig Schmidt did not deny when Mike Floyd testified that Max Craig and Angel Schmidt ran the day-to-day operation of Metro. So none of that was denied. I mean, he basically admitted it. Counsel asked what was Mike Floyd doing for 3S when he was hurt. He was mobilizing the crane that was required by 3S's contract with Bowman, and he was returning the crane rental, which required portal to portal. He was doing both of those things when he was hurt. My final comment is, what about the last 11 words of Section 1A.3, where the principal is contracted for the work to be done. Never mentions that, okay? Talks about the premises, but the premises are defined by the principal's contract. Do you have any case, similar to the question I asked counsel, do you have a case that involves the definition of those words and or about the immediate premises that would support its extension to the route outside of the actual work premises, so that the route that was being traveled would be included in the statute? You know, I looked for a case, and I could not find one. The cases on Section 1A.3 are either very old when it was Section 31, or they're just not, it's just not an issue anymore. So, no, I couldn't find that case. The cases that I found were old cases. The roadway cases can all be distinguished because they didn't involve a contract that required him to be doing what he was doing when he was hurt on that roadway. So, yeah, I would prefer a decision like the commission's on the joint employment issue that wouldn't require it to go further, since there are no real cases on issue on the statutory employment. Okay. Thank you, counsel, all, for your arguments in this matter. We take it under advisement and a written disposition shall issue.